**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LASHAWNDA BATES,

Plaintiff,

Hon.
Case No.

v.

BRONSON HEALTH CARE
GROUP, INC.,

Defendant.

---

Noah S. Hurwitz (P74063)
Colin H. Wilkin (P86243)
HURWITZ LAW PLLC
Attorneys for Plaintiff
340 Beakes St., Ste. 125
Ann Arbor, MI 48103
(844) 847-9489
noah@hurwtizlaw.com
colin@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the complaint.

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff LaShawnda Bates ("Plaintiff"), by and through her attorneys, HURWTIZ LAW PLLC, and hereby alleges the following:

## INTRODUCTION

1. Plaintiff brings this action against Bronson Healthcare ("Defendant"), arising from the discriminatory and retaliatory treatment Plaintiff endured during her employment with Defendant, and the retaliatory and discriminatory conduct Plaintiff endured after engaging in protected activity. Plaintiff suffered adverse employment action when she was terminated on July 6, 2026.

## PARTIES AND JURISDICTION

2. Plaintiff LaShawnda Bates is a resident of Kalamazoo, Kalamazoo County, Michigan.

3. Defendant Bronson Healthcare is a domestic non-profit corporation that transacts business in Kalamazoo, Kalamazoo County, Michigan.

4. The United States District Court for the Western District of Michigan has subject matter jurisdiction over claims under the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000e, et seq., pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's Elliott-Larsen Civil Rights Act claims and Plaintiff's Michigan Public Policy claims pursuant to 28 U.S.C. § 1367.

5. Venue in this Court is proper pursuant to 28 U.S.C. §1391(b), as a substantial part of the events and omissions giving rise to this Complaint occurred within this judicial district.

6. Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") and received Notice of Right to Sue on September 22, 2026.

## FACTUAL ALLEGATIONS

7. Plaintiff incorporates by reference herein the allegations contained in the foregoing paragraphs.

8. Plaintiff is a Black female who was hired by Defendant in June 2022 as a Project Manager and Data Specialist for Cancer Care Equity.

9. In January 2025, Plaintiff took on additional responsibilities as a System Manager for Community Health Workers, where she was effectively performing two roles.

10. Prior to Defendant's retaliatory conduct, Plaintiff consistently received excellent performance evaluations throughout her employment.

11. Prior to Defendant's retaliatory conduct, Plaintiff received no disciplinary action.

12. Despite Plaintiff's exemplary record, she was subject to a hostile work environment of discriminatory treatment based on her race and unlawful retaliation.

13. In June 2025, Plaintiff began reporting to Defendant's Health Equity Fellow, Dr. Karen Garcia.

14. From Plaintiff's first meeting with Dr. Garcia, it was evident that Plaintiff would be subjected to a hostile and toxic work environment characterized by inappropriate treatment, hostility, and conduct that made Plaintiff's workplace increasingly difficult.

15. Dr. Garcia immediately began undermining and excluding Plaintiff from workplace communications, meetings, opportunities, and other matters relating to her position, and did so because of Plaintiff's race.

16. Dr. Garcia treated Plaintiff differently from similarly situated non-black employees and engaged in conduct that demonstrated a discriminatory bias against Plaintiff because she is Black.

17. This discriminatory treatment is further emphasized by Dr. Garcia's refusal to introduce Plaintiff to colleagues and stakeholders while routinely introducing Plaintiff's similarly situated non-black coworkers and Plaintiff's staff to those same individuals.

18. In addition, Dr. Garcia excluded Plaintiff from meetings that directly involved her work whilst inviting her staff.

19. Dr. Garcia criticized and blamed Plaintiff for failing to "look up" a candidate and told her that she "should have known" the candidate would not pass a background check, despite the fact that the outcome of the background check was outside of Plaintiff's control and was not a reasonable basis for holding Plaintiff responsible for the issue.

20. Dr. Garcia told Plaintiff that she "needed mentorship," this criticism was inconsistent with Plaintiff's good performance history.

21. These circumstances created an increasingly hostile and unsafe work environment in which Plaintiff was subjected to.

22. Each time these incidents occurred, Plaintiff reported the discriminatory conduct to Defendants Vice President of DEI, Velois Bowers, who repeatedly dismissed Plaintiff's concerns as "not a big deal."

23. Plaintiff met with Ms. Bowers to explicitly request Human Resources Involvement, but this was continuously discouraged by Ms. Bowers, who advised Plaintiff not to go.

24. At one point, Plaintiff considered resigning from her position due to Dr. Garcia's ongoing hostile and discriminatory conduct, which had created an increasingly difficult work environment for Plaintiff.

25. Eventually, Ms. Bowers facilitated a mediation between Plaintiff and Dr. Garcia, along with a third-party individual not employed by Defendant.

26. During this mediation they agreed to specific terms: Dr. Garcia would introduce Plaintiff to colleagues, and Dr. Garcia would stop excluding Plaintiff from meetings.

27. Dr Garcia and Plaintiff's relationship improved only temporarily following the mediation.

28. On January 19, 2026, Dr. Garcia conducted Plaintiff's annual performance review. This review was Plaintiff's first ever negative performance evaluation during her approximately four years of employment with Defendant.

29. Dr. Garcia marked Plaintiff down on: Plaintiff not completing budgets that Dr. Garcia and Ms. Bowers had specifically instructed Plaintiff not to prepare, and Plaintiff's poor

communication as Dr. Garcia remarked "because we had a rough start," a direct reference to the mediation and Plaintiff's complaints of discriminatory treatment.

30. When Plaintiff objected to Paragraph 29, she explained to Dr. Garcia that she believed Dr. Garcia would not have treated her in that manner if she were a "submissive Black woman."

31. Rather than addressing Plaintiff's concerns, Dr. Garcia immediately accused Plaintiff of calling her racist and called Human Resources.

32. Dr. Garcia's response to Plaintiff's complaints further demonstrates the retaliatory treatment Plaintiff experienced after engaging in protected activity.

33. Later that day, Plaintiff was summoned to a meeting with Dr. Garcia, Ms. Bowers, and Defendant's Human Resources ("HR"), Tenecia Ross. During this meeting, Plaintiff was put on paid administrative leave by HR.

34. In addition, Ms. Ross was hostile and aggressive, yelling at Plaintiff for taking notes and even told her, "This is about you, this is about your behavior and not anyone else."

35. On February 13, 2026, Plaintiff's counsel sent Defendant a formal demand letter on Plaintiff's behalf, detailing the race discrimination and retaliation whilst informing Defendant that Plaintiff had retained counsel and intended to pursue her legal rights.

36. On February 23, 2026, Plaintiff met with Ms. Ross and Dr. Garcia regarding Defendant's proposed path forward. At that meeting Plaintiff was given three options: return to work under a Corrective Development Plan ("CDP"), enter a thirty-day bidding window through April 3, 2026, or terminate her employment.

37. On February 25, 2026, Plaintiff returned to work.

38. Plaintiff had been told prior that signing the CDP was a condition of her return, but the CDP was not ready until approximately a week after she returned.

39. This caused additional anxiety and uncertainty for Plaintiff, because she did not know whether she was complying with the CDP as she was not provided with a copy of it.

40. However, Plaintiff continued to be subjected to heightened scrutiny, shifting expectations, and differential treatment by Dr. Garcia and HR.

41. The CDP process was applied in a pretextual and one-sided manner, which stripped Plaintiff of meaningful management authority while simultaneously using management concerns as grounds to discipline her.

42. In March 2026, Dr. Garcia completed annual performance evaluations for employees who reported directly to Plaintiff without obtaining Plaintiff's input on their work performance.

43. Around the same time, Plaintiff's direct reports were permitted to work on projects and operate outside of normal expectations while her authority to manage, supervise, and course-correct her team was undermined.

44. Defendant continued to characterize Plaintiff's ordinary workplace communications as problematic.

45. On May 27. 2026, Plaintiff responded professionally to an email from Stacy Shern regarding CHIP progress reporting. In that email, Plaintiff wrote that Ms. Shern had attached "a very detailed document," that the document was "very clear," that Plaintiff had "no questions," and that if anything was missing, she would "be more than happy to make any adjustments."

46. Despite the professional tone of that communication, Dr. Garcia told Plaintiff, on May 28, 2026, during a CDP meeting, that the email was “harsh,” that Plaintiff needed to consider “intent vs. impact,” and that Dr. Garcia would make notes of complaints like this about her.

47. Dr. Garcia then extended Plaintiff’s CDP by 30 days.

48. Following the May 28 meeting, Dr. Garcia sent Plaintiff AI-generated meeting notes. Those notes did not mention the 30-day CDP extension.

49. Plaintiff promptly emailed Dr. Garcia to identify the omission and asked where she could obtain a copy of the 30-day extension for her records.

50. Dr. Garcia responded by confirming Plaintiff’s observation and copying Ms. Ross for further steps.

51. Ms. Ross never provided Plaintiff with the requested written extension or any clear written explanation of what the extended CDP required.

52. In June 2026, Dr. Garcia continued to disregard Plaintiff’s management role and undermine her relationship with her direct reports.

53. Plaintiff raised a concern to Dr. Garcia that one of her direct reports felt unsafe and dismissed in leadership meetings. Plaintiff asked Dr. Garcia to keep the conversation private.

54. However, Plaintiff’s direct report contacted her in a panic within the same hour Plaintiff informed Dr. Garcia, stating that Dr. Garcia had reached out to her with an ASAP meeting request. Dr. Garcia is unaware that Plaintiff knows this information.

55. On July 6, 2026, Plaintiff was terminated.

56. At that meeting, Dr. Garcia opened by stating that the meeting was to discuss the way forward with Plaintiff’s CDP.

57. Ms. Ross then told Plaintiff that Defendant decided not to continue her employment.

58. When Plaintiff asked for specifics, Ms. Ross stated that the reasons were written down, but the written materials did not identify specific conduct justifying termination.

59. Defendant's stated reasons for the termination were "continuing performance, communication, and working-relationship concerns," including Plaintiffs' statement that she remained "uncomfortable" working with Dr. Garcia, the very supervisor whose discriminatory conduct Plaintiff had reported.

60. Defendant's stated reason for terminating Plaintiff was pre-textual.

61. Prior to Plaintiff complaining about her discrimination and asserting her legal rights, she was neither disciplined nor did she receive a negative performance review.

62. When Plaintiff reported the discrimination, she was placed on leave.

63. After Plaintiff retained legal counsel, Defendant continued to subject Plaintiff to heightened scrutiny and ultimately terminated her employment.

64. Defendant's reliance on allegations concerning Plaintiff's performance and working relationship with Dr. Garcia was inconsistent with Plaintiff's employment history and the circumstances preceding her termination.

65. These facts support the inference that the reasons offered by Defendant were a pre-text for retaliating against Plaintiff for reporting race discrimination, hostile environment and asserting her legal rights.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

66. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

67. Title VII of the Civil Rights Act prohibits an employer from discriminating against an employee because of her race, 42 U.S.C. § 2000e-2(a).

68. Plaintiff is an African American woman and is therefore a member of a protected class.

69. Prior to the discriminatory and retaliatory conduct described herein, Plaintiff performed her job satisfactorily and consistently met or exceeded Defendant's legitimate performance expectations throughout her employment.

70. Prior to the discriminatory and retaliatory conduct described herein, Plaintiff was not reprimanded, disciplined, or counseled for performance or misconduct.

71. Defendant subjected Plaintiff to disparate and discriminatory treatment because of race, including but not limited to: excluding Plaintiff from meetings, excluding Plaintiff from introductions and professional opportunities, undermining Plaintiff’s authority, and treating Plaintiff differently from similarly situated non-African American employees.

72. Plaintiff suffered adverse employment action when Defendant terminated her employment on July 6, 2026.

73. Defendant's termination was administered in a discriminatory and retaliatory manner.

74. Defendant’s conduct constituted discrimination against Plaintiff because of her race, in violation of Title VII.

75. As a direct and proximate result of Defendant’s discriminatory conduct, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic losses, including but not limited to: lost wages, damages to professional reputation, emotional distress, outrage, humiliation, indignity and disappointment.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII

76. Plaintiff incorporates by reference herein the foregoing paragraphs.

77. Title VII prohibits an employer from retaliating against an employee because the employee has engaged in protected activity, 42 U.S.C. § 2000e-3(a).

78. Plaintiff engaged in protected activity when she reported Dr. Garcia's discriminatory conduct to Defendant.

79. Plaintiff further engaged in protected activity when she retained legal counsel to assert her rights.

80. Following Plaintiff's protected activity, Defendant subjected Plaintiff to adverse employment actions, including but not limited to: negative performance evaluation, administered leave, hostile work environment, heightened scrutiny, Corrective Development Plan, and termination.

81. Due to the temporal proximity between Plaintiff's protected activity and Defendant's adverse employment actions, supports a causal connection.

82. The circumstances surrounding Plaintiff's termination suggest that Defendant terminated her because she asserted her rights under Title VII, showcasing Defendant's conduct was intentional and in violation of Title VII.

83. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic losses, including but not limited to: lost wages, damages to professional reputation, emotional distress, outrage, humiliation, indignity and disappointment.

**COUNT III**
**RACE DISCRIMINATION IN VIOLATION OF THE ELCRA**

84. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

85. The Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq., prohibits an employer from discriminating against an individual with respect to employment because of race. MCL 37.2202(1)(a).

86. At all relevant times, Defendant was an employer, and Plaintiff was an employee covered by and within the meaning of the Elliott-Larsen Civil Rights Act, MCL 37. 2201.

87. Plaintiff is an African American woman therefore she is a member of a protected class.

88. Prior to the discriminatory and retaliatory conduct described herein, Plaintiff performed her job satisfactorily and consistently met or exceeded Defendant's legitimate performance expectations throughout her employment.

89. Prior to the discriminatory and retaliatory conduct described herein, Plaintiff was not reprimanded, disciplined, or counseled for performance or misconduct.

90. Defendant subjected Plaintiff to disparate and discriminatory treatment because of race, including but not limited to: excluding Plaintiff from meetings, excluding Plaintiff from introductions and professional opportunities, undermining Plaintiff's authority, and treating Plaintiff differently from similarly situated non-African American employees.

91. Plaintiff suffered adverse employment action when Defendant terminated her employment on July 6, 2026.

92. Defendants' discriminatory conduct against Plaintiff's race was intentional and in violation of ELCRA.

93. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic losses, including but not limited to: lost wages, damages to professional reputation, emotional distress, outrage, humiliation, indignity and disappointment.

**COUNT IV**
**RETALIATION IN VIOLATION OF ELCRA**

94. Plaintiff incorporates by reference herein the foregoing paragraphs.

95. ELCRA prohibits an employer from retaliating against an employee who made a charge, filed a complaint, or otherwise exercised rights protected by ELCRA. MCL37.2701.

96. Plaintiff engaged in protected activity when she reported Dr. Garcia's discriminatory conduct to Defendant.

97. Plaintiff further engaged in protected activity when she retained legal counsel to assert her rights.

98. Following Plaintiff's protected activity, Defendant subjected Plaintiff to adverse employment actions, including but not limited to: negative performance evaluation, administered leave, hostile work environment, heightened scrutiny, Corrective Development Plan, and termination.

99. Due to the temporal proximity between Plaintiff's protected activity and Defendant's adverse employment actions, supports a causal connection.

100. The circumstances surrounding Plaintiff's termination suggest that Defendant terminated her because she asserted her rights under ELCRA, showcasing Defendant's conduct was intentional and in violation of ELCRA.

101. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic losses,

including but not limited to: lost wages, damages to professional reputation, emotional distress, outrage, humiliation, indignity and disappointment.

**COUNT V**
**VIOLATION OF MICHIGAN PUBLIC POLICY**

101. Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

102. "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Landin v. Shealthsource Saginaw, Inc*., 305 Mich. App. 519, 526 (2014).

103. "Michigan courts recognize that while employment contracts may be terminated at any time for any, or no, reason, certain grounds for discharge are so contrary to public policy as to be actionable." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 374 (6th Cir. 2013).

104. Michigan courts recognize the following public policy exceptions: "exercising a right guaranteed by law, executing a duty required by law, or refraining from violating the law." *Landin v. Shealthsource Saginaw, Inc*., 305 Mich. App. 519, 526 (2014). "[A] claim regarding a breach of public policy ***may be premised on the alleged violation of a federal statute***." *Garavaglia v. Centra, Inc.*, 211 Mich. App. 625, 631, 536 N.W.2d 805, 808 (1995).

105. Defendant knew of Plaintiff's complaints regarding Dr. Garcia's discriminatory behavior.

106. Defendant acted in violation of Michigan public policy when it terminated Plaintiff's employment after she complained to Defendant's Human Resources department about Dr. Garcia's discriminatory comments.

107. The Supreme Court of Michigan recently held that the public-policy exception to at-will employment does extend to discharges in retaliation for internal reporting of alleged

violations of the law. *Stegall v Resource Technology Corporation*, 2016-155043-CD, 2022 WL 2784727 (Mich. July 15, 2022).

108. Defendant violated Michigan Public Policy by terminating Plaintiff after she reported Dr. Garcia's discrimination.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgement in her favor and against Defendant as follows:

a. Compensatory damages for the harm Plaintiff suffered as a result of Defendant's unlawful discrimination and unequal treatment in violation of Title VII; the Elliott-Larsen Civil Rights Act and Michigan Public Policy;

b. Back pay, including lost wages, salary, bonuses, benefits, and other compensation Plaintiff would have received absent Defendant's unlawful conduct;

c. Front pay and/or other equitable relief to compensate Plaintiff for future losses resulting from Defendant's unlawful conduct;

d. Pre-judgement and post-judgement interest;

e. Award Plaintiff reasonable attorney's fees, costs, and interest; and

f. Award such other relief as this Court deems just and proper.

Respectfully submitted
HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*

Noah S. Hurwitz (P74063)
Attorney for Plaintiff
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
noah@hurwitzlaw.com
colin@hurwitzlaw.com

Dated: November 23, 2026

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LASHAWNDA BATES,

Plaintiff,

Hon.
Case No.

v.

BRONSON HEALTH CARE
GROUP, INC.,

Defendant.

---

Noah S. Hurwitz (P74063)
Colin H. Wilkin (P86243)
HURWITZ LAW PLLC
Attorneys for Plaintiff
340 Beakes St., Ste. 125
Ann Arbor, MI 48103
(844) 847-9489
noah@hurwtizlaw.com
colin@hurwitzlaw.com

---

**JURY DEMAND**

NOW COMES Plaintiff LaShawnda Bates, by and through her attorneys, HURWITZ LAW PLLC, hereby demand a jury trial in the above-captioned matter for all issues so triable.

Respectfully submitted
HURWITZ LAW PLLC

*<u>/s/ Noah S. Hurwitz______</u>*
Noah S. Hurwitz (P74063)
Attorney for Plaintiffs
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
noah@hurwitzlaw.com
colin@hurwitzlaw.com

Dated: November 23, 2026